## Case No. 135.

### The ALBEMARLE.

[8 Blatchf. 200.][1]

Circuit Court, S. D. New York. Feb. 6, 1871.

COLLISION—BETWEEN STEAMERS—SIGNALS—DAMAGES.

1. In this case, two steamers were meeting nearly end on. so as to involve risk of collision. One of them gave a signal of one whistle. The other responded by a signal of one whistle. Then both of them ported, but they collided: *Held*, that it was the duty of each to port in due season, and that each of them failed to port soon enough.

[Cited in The City of Hartford. Case No. 2,752. Distinguished in The Sammie, 37 Fed. Rep. 909.]

[See note at end of case.]

2. *Held*, also, that, if it was erroneous and dangerous to port, the vessel giving the signal as a proposition to the other, was not more culpable for doing so, than the vessel which assented, by the response, to the proposed movement, and that both became parties concurring in a hazardous and erroneous experiment.

[Cited in The City of Hartford, Case No. 2,752.]

3. One of the vessels held in fault for not having a proper and vigilant look-out, and both vessels held in fault, and a decree made that both share in the loss.

[Appeal from the district court of the United States for the southern district of New York.]

[In admiralty. Libel for collision. Decree finding both vessels in fault.]

Charles Donohue, for libellant.

Edward H. Owen, for claimants.

WOODRUFF, Circuit Judge. At about 9½ o'clock in the night of the 20th of August, 1867, off the coast of New Jersey, a few miles below Barnegat light, the steamship James T. Brady, belonging to the libellant, and the steamship Albemarle came into collision. The latter was bound from New York to Norfolk, and the former from Delaware bay to New York. The libellant's witnesses describe the Albemarle as approaching in a course heading almost directly towards the Brady, but being, when sighted, slightly off the port bow. Those on the

[1][Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

Albemarle describe the Brady as seen off the starboard bow, and testify that she continued to approach, opening more and more on the starboard bow. When within 500 yards apart, their speed being, respectively, the Brady, 11 or 12 miles, and the Albemarle, 8 or 9 miles, the Brady blew one whistle, to signify her wish to port her helm and pass to the right. The Albemarle responded with one whistle, indicating her assent. On receiving the response, the Brady ported and swung towards the east. The Albemarle, as her witnesses testify, also ported, but, before her course was much changed, the two vessels came together. The witnesses from the Brady testify that the Albemarle did not port, but starboarded, and that she ran into the Brady on a starboard wheel. The contradiction between the witnesses for the respective parties is not necessarily so great as a cursory perusal of the testimony would suggest, touching the position and course of the two vessels and the bearing of each from the other. Thus, the course of the James T. Brady was, as her witnesses represent, north-east by north, and she saw the lights of the Albemarle when from 1½ to 2 miles distant, about one point over her port bow, and the bearing continued about the same or diminishing to half a point, until the Brady gave the signal, by her one whistle, that she proposed to port and pass to the eastward of the Albemarle, and, at some moments, her white light, and then her red and white lights, and then her green and white lights, and for a time all three lights, were visible. The course of the Albemarle, as her witnesses testify, was south southwest. She saw the James T. Brady at a distance of five miles, seeing first her white light and then her green light. When first seen, the witnesses state, she bore from two to two and a half points on their starboard bow, and her green light continued in view until she ported, in accordance with the signal before mentioned.

Now, if the two courses above stated be assumed to be nearly accurate, and the position of the respective vessels, when the Albemarle sighted the Brady, was such that the point of intersection of the courses was considerably nearer to the Albemarle than to the Brady, it would follow that the Albemarle would see the Brady at about one and a half or two points off her starboard bow, and she would, as they approached each other, continue to bear over such starboard bow; while, also, when the Brady reached a point distant two miles from the Albemarle, the latter would bear about one point off the Brady's port bow, and that bearing would continue, or gradually draw in towards the bow, until the Albemarle reached the point of intersection. The relative speed of the Brady being, however, the greatest, they might reach the point of intersection at about the same moment. In such case, if courses and bearings were alone considered,

it is obvious, that, if they were regarded as meeting on opposite courses, nearly end on, so as to involve danger of collision, it would be the duty of each to port and pass to the right; or, if they were regarded as crossing, so as to involve danger of collision, then, as the Albemarle had the Brady on her starboard, it would be the duty of the Albemarle to keep out of the way, and the·duty of the Brady to keep her course. The testimony of the witnesses on either side, therefore, in respect to the position and course of the vessels and their respective bearings from each other, is in no conflict that is not entirely reconcilable or that would suggest any distrust of either; and, in this view, the testimony from each corroborates the testimony from the other. It follows, therefore, that the testimony of the witnesses produced from the James T. Brady, that they, when at about one mile, or one mile and a half, from the Albemarle, had her about one point on their own port bow, and that her bearing on that bow was diminished to about half a point, is not only not contradicted but is strengthened by the evidence from the Albemarle; and, at the same time, their testimony that they saw all three of the Albemarle's lights, and that there was such variation as to give them at one time a glimpse of the red without the green, and again of the green without the red, is not improbable. The Albemarle, in the position she was, would show her red light, and, if she first reached the point of intersection, she would next show the green; or, without this, in even a moderate shifting of the vessel by the waves, the lights might be exhibited to the Brady as her witnesses say they saw them. Up to this point then, the witnesses from the Brady not only give a possible, but a probable, account of the position and manner of approach of the two vessels, and of the manner in which the lights of the Albemarle were presented to their view, but the witnesses from the other vessel corroborate them. The conclusion from this would be inevitable, that the vessels, from the time the Brady saw the Albemarle, were meeting nearly end on, so as to involve risk of collision, in which case it was the duty of both to port, without waiting for signals, and that the Albemarle should have done so. But here the harmony of the testimony stops. The witnesses from the Albemarle testify, not only that the Brady's green light was in view, and about two points on her starboard bow, so soon as she came near enough to make colored lights visible, but they further testify that her green light continued to open until it bore about four points on that bow. If the Albemarle had passed the intersection of the two courses, when this last observation was made, she might have brought the Brady's green light four points on her starboard bow. Until she reached that point of intersection, the light of the Brady would close in upon that bow, and, after passing it

would open, and might open so far as to bear four points off. But this cannot be harmonized with the testimony from the Brady. It would bring the Albemarle largely off the starboard bow of the Brady before she ported. It may be true, but the general conformity of the testimony of all the witnesses in other respects disposes me to think, that, while the witnesses from the Albemarle are correct in saying that they saw the green light of the Brady off their own starboard bow, they have over-estimated the time and degree. This critical examination and comparison of courses, distances and bearings is subject to this obvious remark, that, in practice, it is not to be expected that witnesses will be able to testify to very close mathematical or geometrical observations, and we must regard general conformity in relation to leading facts as usually convincing. I cannot resist the conclusion, that the vessels were so approaching that it was the duty of each to port the helm in due season, and that, in this respect, both vessels were in fault. The movement should have been earlier made.

The prompt and ready response of the Albemarle to the whistle of the Brady is very important in its influence upon the question whether, in truth, the Brady was four points off the starboard bow at that time, and so near that her porting brought them almost instantly together. It must and ought to be taken to be incredible, that, if such was the then position and course of the vessels, the Albemarle would have assented to such a manoeuvre. In that situation, it was grossly improper, and both proposition and assent indicated gross unskillfulness and ignorance, or gross inattention and negligence. These concurring, would, I think, of themselves alone, make a case for contribution to the loss caused by the concurring fault of both. I have, more charitably, I think, regarded the assent of the Albemarle as indicating that the Brady was not in the relative position stated; but, in either view, the Albemarle would not be without fault.

It is doing no injustice to the Albemarle to say, that the assent of her officers to the signal to port the helm, given by the Brady, is strong evidence that, at the time, they did not regard it as an improper movement, and better evidence that the vessels were approaching nearly end on than testimony of those same officers, given on a retrospective view of the occurrence, under a strong motive to cast all the blame upon the Brady. And the alternative again recurs— if the movement was so obviously improper as they now represent, they were concurring actors in the unskillfulness or error which caused the loss. I do not say that the Albemarle, by assenting to the signal of the Brady to port the helm and go to starboard, is estopped to allege that it was wrong in the Brady to do so, or that, in a sudden exigency, caused by the fault of

another vessel, she is to be held accountable for an erroneous judgment formed on the instant. But, here, the Brady gave the signal and waited a reply. That reply assured her that the approaching vessel concurred with her in her opinion as to what was required of both. Then, and not until then, she ported her helm, and the Albemarle did the same; but it was too late to avoid collision. Both being in an open sea, each having the same opportunity to judge what prudence required, I cannot regard the proposition of the Brady, even if it was erroneous, as any more culpable than the assent of the Albemarle, so that, if it was wrong, they shared in the mistake. But, in truth, the grand fault of both vessels was, that they did not act sooner, instead of waiting till instant collision was impending. The rule of the statute is as imperative as any other, that, when approaching so as to involve risk of collision, each should slacken speed, and, if necessary, stop and reverse. This should not be delayed till efforts to slow, stop and reverse will be useless.

That the Brady was not free from fault, on still other grounds, is quite clear. She had no proper look-out; or, if the man at her bow was competent, then he was not vigilant. He ought to have seen the Albemarle as soon, or nearly as soon, as the Brady was seen from the Albemarle. The look-out did not report the Albemarle until within one and a half or two miles distant. True, he says he thinks she was three miles off, but he had only the short experience of three months at sea, and his judgment is contradicted by two experienced pilots on board. He did not report her until she had been seen by the man at the wheel, and the pilot in charge did not discover her until the man at the wheel called his attention to her. This shows great want of vigilance, and, although there was then time to make whatever movement the case required, yet, as they were approaching at a combined rate of twenty miles an hour, it left them a very short time in which to note the position, course and lights of the Albemarle, and apply the discretion which they were bound to exercise.

An alternative view of the duty of the Albemarle, founded upon the rule that, when ships are crossing, so as to involve risk of collision, that which has the other on her starboard, must keep out of the way, and the other should keep her course, will also make the Albemarle a sharer in the fault.

If the view presented by the testimony of her witnesses be adopted, and, when the signal was given by the Brady, the latter bore four points off her starboard bow, it was a clear fault in the Brady to attempt to cross, without first consulting the Albemarle. The Albemarle had the right to insist that the Brady should keep her course. When both agreed that the experiment of crossing should be made, they be-

came concurring parties to the experiment and mutual sharers in the hazard.

The criticism, that it was a perilous movement of the Brady, and that she had no right to put the Albemarle in a critical situation and hold her responsible for a hasty judgment, proves too much. For, if there was, at that moment, no peril, there was nothing in the mere proposition, which required the officers of the Albemarle to act hastily. If the position of the two was such that it was plain that the Brady ought not to port, and that the Albemarle was safe without any change, then her officers acted in no sudden exigency, for the Brady did not change until the assent of the Albemarle thereto was given. The criticism, therefore, involves this, namely, that an exigency had in fact already arisen, in which, and in a consciousness of danger, the Albemarle received the signal, and was called on to exercise instant judgment. This is precisely what has been already above stated, and it puts the Albemarle in fault, in not herself acting sooner, either by slowing, or by changing her course, or by herself signalling the Brady. This view of the subject brings me, as every view of the case which I think warranted by a full consideration of the testimony on both sides does, to the conclusion, that these two vessels were both in fault, and that they should share in the loss which resulted therefrom. A decree must be entered in conformity with that view.

[NOTE. Where two steamers approaching each other were negligent, one in not having her side lights properly screened, and the other in porting instead of starboarding her helm, the loss was divided. The North Star, Case No. 10,331. Two steamers collided in a dense fog, both going at the same rate of speed. Libel by one to recover damages from the other was dismissed. The Sylph, Id. 13,711. For further cases involving negligence in the disregard of rules. see The Hansa, Id. 6,038; The Cayuga, Id. 2,537; Hazlett v. Conrad. Id. 6,-288; The America, Id. 280; The D. S. Gregory, Id. 4,100; The Electra, Id. 4,337; The Warren, Id. 17,192; The Mary Sandford, Id. 9,225; The Cumbria, Id. 3,472.]